[No. 6178.  Decided August 25, 1906.]

Ross Nelson, *Appellant*, v. Peter John, *Respondent*.[1]

Indians—Allotments—Restrictions Upon Alienation.  The restrictions upon alienation of the lands allotted to the Indians of the Puyallup tribe, under the treaty of 1854, are not invalid because repugnant to the grant and made on consideration, since the statute authorizing the allotments to the Indians and the policy of the government render the Indians wards of the government, and the restrictions necessary and valid.

Same—Citizenship—Statutes—Implied Repeal.  The Bland act conferring citizenship upon the Puyallup Indians did not impliedly repeal the restrictions upon alienation of Indian lands, allotted in severalty to the members of the tribe.

Same—Contract by Indians—Removal of Restrictions on Alienation.  All contracts for the conveyance of lands, made by the Puyallup Indians prior to the removal of the restrictions upon alienation thereof are void, and the Act of Congress of March 3, 1893, consenting to the removal of such restrictions, provided that such removal should not take effect until ten years after the passage of the act.

Appeal from a judgment of the superior court for Pierce county, Huston, J., entered October 21, 1905, in favor of the defendant, upon sustaining a demurrer to the plaintiff's complaint, in an action for the specific performance of a contract by an Indian to convey land.  Affirmed.

*James M. Ashton* and *Frank H. Kelley,* for appellant.

*George H. Funk,* for respondent.

Root, J.—Plaintiff is now, and for a long time has been, a citizen of the United States and of the state of Washington, and a resident of the city of Tacoma in said state.  John Salerhand and Chekudakai Salerhand, his wife, whose estates are parties defendant herein, were Indians of the Puyallup tribe, being in life on the 30th day of January, 1886, and until after the 7th day of March, 1892.  John Salerhand died intestate in the fall of 1893 or 1894, leaving

[1]Reported in 86 Pac. 933.

surviving him his wife, Chekudakai Salerhand, and a son, Peter John (Salerhand). Chekudakai Salerhand died intestate January 19, 1900. In 1854 the United States of America made and entered into a treaty with the several Indian tribes adjacent to Puget Sound, of which the Puyallup tribe was one, by the terms of which, in consideration of the extinguishment of the Indian title to the lands, and sundry promises on the part of these several tribes upon other matters, the United States promised to continue the Indian title of use and occupancy to these several tribes as to several tracts of land, the reservations, and under certain conditions to give to individual members of these tribes an equivalent right of the use and occupancy of separate tracts or parcels of these reservations, by allotment, and under other and further conditions, to convey such tracts or parcels to these individual allottees by patent; subject, however, to a restriction upon the alienation of such patented land, the restriction to continue in force until the legislature of this state should remove it; but the legislature was not to remove such restriction without the consent of Congress.

On or before the 30th day of October, 1884, pursuant to the provisions of the aforesaid treaty, there was allotted to John Salerhand, as the head of the family consisting of himself and his wife, a certain tract or parcel of land situated on the Puyallup reservation, and more fully described as follows: Lot four, in section three, in township twenty, north of range three east of the Willamette Meridian, containing thirty-seven and ninety-seven one-hundredths acres. Thereafter, on the 30th day of January, 1886, said tract or parcel of land (with other lands) was conveyed to the said John Salerhand by patent, in words and figures as follows:

"THE UNITED STATES OF AMERICA. To all to whom these presents shall come, greeting:

"Whereas, by the sixth article of the treaty concluded on the 26th day of December, Anno Domini one thousand eight

hundred and fifty-four, between Isaac A. Stevens, governor and superintendent of Indian affairs of Washington Territory, on the part of the United States, and the chiefs, headmen and delegates of Nisqually, Puyallup, Steilacoom, Squawksin, S'Momamish, Ste-chass, T'Peeksin, Squi-ailt and Sa-heh-wamish tribes and bands of Indians, it is provided that the President, 'at his discretion, cause the whole or any portion of the lands hereby reserved, or of such other lands as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable.'

"And whereas, there has been deposited in the General Land Office of the United States an order bearing date January 30, 1886, from the Secretary of the Interior, accompanied by a return dated October 30, 1884, from the office of Indian Affairs, with a list approved October 23, 1884, by the President of the United States, showing the names of members of the Puyallup band of Indians who have made selections of land in accordance with the provisions of the said treaties, in which lists the following tract of land has been designated as the selection of John Salerhand, the head of a family consisting of himself and Chekudakai, his wife, viz.: Lot four in section three (3) in township twenty (20) north of range three (3) east of the Willamette Meridian, containing thirty-seven and ninety-seven hundredths (37.97-100) acres.

"Now, know ye, that the United States of America, in consideration of the premises and in accordance with the directions of the President of the United States under the aforesaid sixth article of the treaty of the sixteenth day of March, Anno Domini one thousand eight hundred and fifty-four, with the Omaha Indians, has given and granted, and by these presents does give and grant, unto the said John Salerhand, as the head of the family as aforesaid, and unto his heirs, the tract of land above described, but with the stipulation contained in the sixth article of the treaty with the Omaha Indians, that the said tract 'shall not be aliened or leased for a longer term than two years; and shall be exempt from levy, sale or forfeiture, which conditions shall continue in force

until a state constitution embracing such lands within its boundaries shall have been formed and the legislature of the state shall remove the restriction,' and 'no state legislature shall remove the restrictions . . . without the consent of Congress.

"To have and to hold the said tracts of land, with the appurtenances, unto the said John Salerhand, as head of the family, as aforesaid."

On the 9th day of March, 1892, John Salerhand and Chekudakai, his wife, made and entered into an agreement with the plaintiff herein, which agreement was duly acknowledged and recorded in the office of the auditor of Pierce county on said date, in words and figures as follows:

"This Indenture Witnesseth, That John Salerhand and Chekudakai Salerhand, his wife, of Pierce county, Washington Territory, parties of the first part, for and in consideration of the sum of three hundred in gold coin of the United States of America, to them in hand paid by Ross Nelson, of Tacoma, Pierce County, Washington Territory, party of the second part, has granted, bargained and sold, and by these presents do grant, bargain, sell and convey unto the said party of the second part, and to his heirs and assigns, for two years from the date hereof, the following described premises, situate, lying and being in the county of Pierce, territory of Washington, to wit: Beginning at the center of section three in township twenty (20) north of range three (3) east, thence along the quarter section line forty two rods (42), thence south parallel with the north and south end quarter line to the south boundary line of lot four (4) in said section three (3). Thence west along the south boundary line of the Puyallup river, thence down the stream to the intersection of the north and south one-quarter line, thence north along said line to the place of beginning, containing twenty acres of land. This instrument and conveyance is continued in force after two years and is made absolute on the further consideration of six thousand dollars, which shall be due and payable by the grantee to the grantor under this instrument within ninety days after the approval hereinafter provided for. The intention being that this indenture is and shall be binding on the grantors herein, their heirs, executors, administrators, as-

signs, and legal representatives forever, and that it conveys to the grantee herein, his heirs, executors, administrators, assigns and legal representatives forever, the hereinabove mentioned land and real estate, and that the same is hereby granted, bargained, sold and conveyed by this instrument for all time, and this indenture shall operate as a deed of absolute conveyance in fee simple of said above described real estate, and property by the grantors herein, their heirs, executors, administrators, assigns and legal representatives to the grantee herein, his heirs, executors, administrators, assigns and legal representatives, without any further writing, upon approval of the same, in accordance with the terms of article sixth of the treaty of the Omahas, so far as the same may be applicable; said treaty bearing date March sixteenth (16th), 1854. To have and to hold the said premises with their appurtenances unto the said party of the second part, his heirs and assigns forever, and we, the said parties of the first part, do hereby covenant to and with the said party of the second part, his heirs and assigns, that we are the owners in fee simple of said premises, that they are free from all encumbrances; and that we will warrant and defend the same from all lawful claims whatsoever. Witness our hands and seals this ninth day of March, A. D. one thousand eight hundred and ninety-two."

An act of Congress enacted in 1887 provides that individual Indians to whom allotments of land have been made shall have the benefit of, and be subject to, the laws, both civil and criminal, of the state in which they are resident, and all Indians born within the territorial limits of the United States, who have taken up a residence separate and apart from any tribe of Indians, and have adopted the habits of civilized life, are declared to be citizens of the United States, and entitled to all the rights, privileges and immunities of said citizenship, without, however, impairing the right of such citizen Indian to his tribal or other property. In 1890 the legislature of the state of Washington passed an act removing any and all restrictions upon the power of Indian holders of real estate, except only that such alienation should be evidenced by writings to be acknowledged by the grantor

before a judge of a court of record. Congress, by the act of
March 3, 1893, provided for the sale of lands allotted to the
Indians of the Puyallup tribe. Subsequently, the defendants,
C. P. Ferry, John J. McKone, Leigh Allen, and McDon-
ald & Todd, by conveyances made in accordance with the pro-
visions of the act of Congress of 1893, acquired a color of
right in and to the lands in question by mesne conveyances
from the Puyallup Indian commissioners appointed under
and by virtue of said act. The plaintiff began his action
against the defendants herein in the superior court of Pierce
county. The defendant Peter John appeared to defend the
action. None of the other defendants appeared therein. To
the complaint of the plaintiff, the defendant Peter John de-
murred on the ground that the facts stated therein did not
constitute a cause of action against this defendant. The de-
fendant's demurrer was sustained, and the plaintiff having
refused to plead further, judgment for the defendant was
rendered. From this judgment plaintiff appeals.

The appellant's argument may be summarized as follows:
(1) The restrictions on alienation, contained in the Saler-
hand patent, are personal to the grantee therein, because if
this be not so, then the restrictions, being incompatible with
and repugnant to a grant in fee, would be, for that reason,
void; (2) these restrictions upon alienation have been im-
pliedly repealed by what is commonly referred to as the
"Bland Act" (24 Stat., p. 388); (3) these restrictions upon
alienation have been removed by the legislature of the state
of Washington, acting with the consent of Congress (Laws
1889-90, p. 499; Act of Congress, March 3, 1893, 27 Stat.,
p. 633.). Appellant contends that, whatever title Salerhand
acquired in the lands in question came to him from the United
States under the treaty of 1854, and was so acquired for a
valuable consideration rather than of the bounty of the sov-
ereign. He invokes the rule that a restraint upon alienation
in a deed creating an estate with which the restriction is

repugnant is inoperative, null, void, and of no effect; and urges that this rule is applicable to the deed here in question, for the reason that the grant is not a gift from the government, but came in exchange for valuable considerations with which this Indian, in common with others of his tribe, parted. In his argument appellant says:

"The reason for the rule against restraint on alienation is that it is contrary to public policy; that one of the inherent powers of ownership is the power to divest one's self of that ownership; that the public good requires the free and unrestricted circulation of property."

Conceding this argument to be sound, it must nevertheless be apparent that it is not applicable to the grant made to this Indian. However contrary to public policy a restraint upon alienation may be, speaking generally, it has been and was the policy of the government, in enacting a statute providing for these deeds to Indians, to restrict the power of alienation therein. This policy plainly appears in the statute itself, and by the provisions required to be set forth and appearing in the deeds of conveyance. The reasons for this policy and these restrictions will at once occur when we contemplate the inexperience of the Indians and their general condition and characteristics before becoming educated and thoroughly civilized, which have necessarily rendered them, for a considerable period, at least, wards of the government. We think all of the contentions made by appellant have been heretofore decided adversely to him by this court. *Bird v. Winyer,* 24 Wash. 269, 64 Pac. 178; *Jackson v. Thompson,* 38 Wash. 282, 80 Pac. 454; *Guyatt v. Kautz,* 41 Wash. 115, 83 Pac. 9. In answer to his contention that the act of Congress has impliedly repealed the restrictions upon alienation, we may cite: *Frazee v. Spokane County,* 29 Wash. 278, 69 Pac. 779; *United States v. Flournoy Live-Stock etc. Co.,* 69 Fed. 886; *United States v. Flournoy Live-Stock etc. Co.,* 71 Fed. 576; *Pilgrim v. Beck,* 69 Fed. 895; *Beck v. Flournoy Live-Stock etc. Co.,* 65 Fed. 30.

As to the effect of the act of the legislature of Washington of 1889-90, page 499, together with the act of Congress of March 3, 1893, we may say that the express provisions in those acts would prevent them from having the effect claimed by appellant upon the deed in question. Section 3 of the Washington statute says:

"This act shall take effect and be in force from and after the consent to such removal of the restrictions shall have been given by the Congress of the United States."

The act of Congress of March 3, 1893, (Wilson Act, 27 Stat. p. 633), was subsequent to the deed from Salerhand, said conveyance being dated March 9, 1892. The Wilson act also contained this provision:

"And provided further that the Indian allottees shall not have power of alienation of the allotted lands not selected for sale by said commission, for a period of ten years from the date of the passage of this act. . . ."

Lands not selected by the commission for sale could not be sold until March 3, 1903. As showing that deeds by Indians of allotted lands made in contravention of restraints on alienation are treated as void, see: *Libby v. Clark,* 118 U. S. 250, 6 Sup. Ct. 1045, 30 L. Ed. 133; *Smith v. Stevens,* 10 Wall. 321, 19 L. Ed. 933; *Laughton v. Nadeau,* 75 Fed. 789; *Eells v. Ross,* 64 Fed. 417; *Briggs v. Sample,* 43 Fed. 102; *Smythe v. Henry,* 41 Fed. 705, and cases *supra.* That the restriction upon alienation placed in this Indian's deed was valid, we believe to be sustained upon both principle and authority. To hold otherwise would be to, in no small measure, thwart the beneficent purposes which the government had in mind in providing an allotment of tracts of land to these Indians, and would be to permit or make possible the very evils which Congress foresaw and endeavored to provide against.

The judgment of the superior court is affirmed.

MOUNT, C. J., DUNBAR, FULLERTON, and CROW, JJ., concur.